**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

# 09 CV 10149

------------------------------------------------- X

IRON WORKERS DISTRICT COUNCIL
OF TENNESSEE VALLEY & VICINITY
PENSION PLAN, Derivatively on Behalf
of CBS CORPORATION,

             Plaintiff,

     v.

SUMNER M. REDSTONE, LESLIE
MOONVES, FREDERIC G. REYNOLDS,
SUSAN C. GORDON, JOSEPH A.
CALIFANO, JR., GARY L.
COUNTRYMAN, CHARLES K.
GIFFORD, BRUCE S. GORDON, LINDA
M. GRIEGO, DOUG MORRIS,
FREDERIC V. SALERNO, DAVID R.
ANDELMAN, WILLIAM S. COHEN,
LEONARD GOLDBERG, ARNOLD
KOPELSON, and SHARI REDSTONE,

             Defendants,

       and

CBS CORPORATION, a Delaware
corporation,

         Nominal Defendant.

------------------------------------------------- X

Case No.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS, AND UNJUST
ENRICHMENT



DEMAND FOR JURY TRIAL

Plaintiff, by its attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of CBS Corporation ("CBS" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of law, including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, that have caused substantial monetary losses to CBS and other damages, such as to its reputation and goodwill.

2.      CBS is a mass media company that is dominated and controlled by Sumner Redstone ("Redstone"), the Company's founder and executive chairman. Redstone controls CBS through National Amusements, a theater chain that holds 81.2% of CBS' voting shares.

3.      During 2008, National Amusements owed $1.6 billion in loans to a consortium of banks and investors. These loans were subject to covenants directly tied to CBS' stock value, which required National Amusements to make accelerated payments on the principal of the loan if CBS' stock price dropped below a certain amount. Since most of Redstone's wealth is tied to National Amusements, Redstone was motivated to ensure that CBS' stock value did not drop below a certain amount to avoid triggering the loan covenants.

4.      During 2008, however, CBS' stock value and market capitalization began to plummet, as the Company's revenues fell. Throughout 2008, as CBS' market capitalization dropped, CBS' book value, which represents the valuation of the Company as reported in its financial statements, increased. This resulted in a multi-billion dollar discrepancy between CBS' market capitalization and book value.

5.      Generally Accepted Accounting Principles ("GAAP") require that "the excess of the cost of an acquired entity over the net of the amounts assigned to assets acquired and liabilities assumed shall be recognized as an asset referred to as goodwill." Statement of Financial Accounting Standards ("SFAS") No. 141, at 43. As described in more detail below, from 2000 to 2005, CBS and its various predecessors were involved in mergers and acquisitions. As a result of these transactions,

- 1 -

CBS was required to carry billions of dollars worth of an intangible asset commonly known as "goodwill" on its financial statements.

6.      Under GAAP, intangible assets, such as goodwill, must be tested for impairment at least annually and "more frequently if events and circumstances indicate the asset might be impaired." SFAS No. 142, at, 14-15. CBS' declining market capitalization was a strong indicator that the Company's intangible assets were impaired and the amount reported on the Company's financial statements for goodwill was severely inflated because a substantial portion of the Company's assets were tied to goodwill.

7.      CBS was no stranger to massive goodwill write-downs. During CBS's fiscal fourth quarter 2005, the Company wrote-down its goodwill by $9.48 billion to reflect the declining value of its television and radio segments. And during CBS' predecessor's fiscal 2004, CBS' predecessor wrote down $18 billion to reduce the carrying amount of goodwill and intangible assets related to the Radio and Outdoor business segments. Redstone, however, was reluctant to take a substantial write-down during the fourth quarter of 2007. He knew that a write-down of goodwill would result in a further decline in CBS' stock value, which would violate National Amusement's loan covenants. As a result, Redstone desperately wanted to avoid this write-down.

8.      During October 2008, however, time ran out for Redstone. This is because throughout 2008, CBS' share price continued to decline, and the discrepancy between CBS' book value and market capitalization continued to widen, increasing from $3.2 billion as of the end of CBS' fiscal 2007 to a staggering $8.8 billion discrepancy as of the end of CBS' fiscal second quarter 2008. And this widening discrepancy did not go unnoticed. A *Bloomberg* columnist noted in a May 23, 2008 article that the book value of CBS goodwill standing alone was apparently "more valuable than *the company as a whole*."

9.      On October 10, 2008, CBS finally took a $14 billion write-down of the carrying value of goodwill and intangible assets related to FCC licenses and investments. Following this write-down, CBS' market value declined by $1.3 billion, which violated the National Amusements principal payment loan covenants that Redstone had sought to avoid. As a result, National Amusements was required to make accelerated principal payments on its loans, and Redstone was

forced to sell $233 million worth of his shares in CBS and Viacom Inc. at depressed prices to raise cash to meet payments on the loans.

10.     The timing of CBS' write-down, the consequent decline in CBS's shares, the triggering of National Amusements' accelerated principal payments, Redstone's control of CBS through National Amusements, and Redstone's required stock sale all support the inexorable inference that Redstone used his dominance and control over CBS to keep CBS from writing-down CBS's goodwill book value, as it was required to do. In any case, however, Redstone was unjustly enriched by the improper write-down delay because the delay allowed Redstone's National Amusements to avoid the crisis of liquidity that the accelerated principal payments ultimately engendered. This action asserts damages and equitable relief to address that unjust enrichment, related waste and breaches of fiduciary duties by the other defendants and other harm to the Company.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(1) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Each of the trustees of Iron Workers District Council of Tennessee Valley & Vicinity Pension Plan ("Iron Workers") is either a citizen of Tennessee or Alabama.     Defendants are citizens of California, New York, Connecticut, Massachusetts, and Maryland. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on this court of a court of the United States that it would not otherwise have.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

- 3 -

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) CBS maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to CBS, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District..

## THE PARTIES

14.     Plaintiff Iron Workers was a shareholder of CBS at the time of the wrongdoing complained of and has continuously been a shareholder and is a current CBS shareholder. Each of the trustees of Iron Workers is either a citizen of Tennessee or Alabama.

15.     Nominal defendant CBS is a Delaware corporation with its principal executive offices located at 51 West 52nd Street, New York, New York. On December 31, 2005, the former Viacom Inc. ("Former Viacom") separated into two public companies (the "Split"): the new Viacom Inc. ("Viacom ") and CBS. This Split followed a previous merger of the two companies. (During 2000, Former Viacom acquired the former CBS Corporation ("Former CBS").) Defendant Redstone, through National Amusements, controls both CBS and Viacom. As a result of the 2000 acquisition and 2005 split, CBS' largest balance sheet asset is its intangible goodwill asset.

16.     Defendant Redstone is CBS' Executive Chairman of the Board of Directors (the "Board") and has been since the Split. Redstone was Former Viacom's Chief Executive Officer ("CEO") from 1996 to 2005 and Chairman of the Board from 1987 to 2005. According to CBS' public filings, Redstone considers himself to be CBS' founder following the Split. Defendant Redstone dominated and controlled CBS and its Board. Redstone used his domination and control over CBS to keep it from writing-down its goodwill book value, as it was required to do. Redstone feared that a decline in CBS' stock price, which would result from a goodwill write-down, would violate principal payment covenants attached to $1.6 billion in debt owed by his National Amusements company. Further, Redstone was unjustly enriched by the improper write-down delay

- 4 -

because the delay allowed Redstone's National Amusements to avoid the liquidity crisis ultimately engendered by the accelerated principal payments triggered by the breach of National Amusement's loan covenants. As a result of the delay in impairment testing and write-down, CBS' fiscal 2007 and first and second quarter 2008 financial results were improper. Redstone knowingly made these improper financial statements. CBS paid Redstone the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Deferred Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $1,003,846 | $5,500,000 | $3,768,315 | $1,586,179 | $13,453 | $17,418 |

Defendant Redstone is a citizen of California.

17. Defendant Leslie Moonves ("Moonves") is CBS' President and Chief Executive Officer and a director of CBS and has been since the Split. Moonves was Former Viacom's Co-President and Co-Chief Operating Officer from June 2004 to the Split. Moonves was also CBS Broadcasting's Chief Executive Officer from 1998 to June 2004; President from 1998 to 2003; and Chairman from 2003 to June 2004. Defendant Moonves knowingly or recklessly made and certified improper financial statements that did not properly account for the valuation of CBS' goodwill and other intangible assets. CBS paid defendant Moonves the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Deferred Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $3,513,462 | $9,500,000 | $11,560,836 | $6,833,750 | $324,035 | $229,981 |

Defendant Moonves is a citizen of New York.

18. Defendant Frederic G. Reynolds ("Reynolds") was CBS' Chief Financial Officer from the Split to July 2009 and Executive Vice President from the Split to August 2009. Reynolds was Former Viacom's Chief Financial Officer from 2000 to the Split and Executive Vice President from 2000 to the Split. Reynolds was CBS Television Station Group's President from 2001 to December 2005; Former CBS and predecessor Westinghouse Electric Corporation's Executive Vice President and Chief Financial Officer from 1994 to 2000; and Chief Financial Officer of Former CBS from April 1996 to 1997. Defendant Reynolds knowingly or recklessly made and certified improper financial statements that did not properly account for the valuation of CBS' goodwill and other intangible assets. CBS paid defendant Reynolds the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Deferred Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $1,756,731 | $3,400,000 | $2,163,983 | $1,238,102 | $158,259 | $24,534 |

Defendant Reynolds is a citizen of New York.

19.     Defendant Susan C. Gordon ("S. Gordon") was CBS's Senior Vice President, Controller and Chief Accounting Officer from December 2005 to August 2009. S. Gordon was Former Viacom's Senior Vice President from May 2002 to December 2005; Chief Accounting Officer from April 1995 to May 2005; Vice President from April 1995 to May 2002; Controller from April 1995 to December 2005; and Vice President, Internal Audit October 1986 to April 1995. S. Gordon was Former Viacom Broadcasting's controller from June 1985 to October 1986. S. Gordon joined Former Viacom in 1981. Defendant S. Gordon knowingly or recklessly made improper financial statements that did not properly account for the valuation of CBS' goodwill and other intangible assets. Defendant S. Gordon is a citizen of New York.

20.     Defendant Joseph A. Califano, Jr. ("Califano") is a CBS director and has been since the Split. Califano was a director of Former Viacom from 2003 to the Split. Califano is a member of CBS' Audit Committee and has been since at least 2007. Defendant Califano knowingly or recklessly: (i) reviewed and approved improper financial statements that did not properly account for CBS' goodwill and intangible asset valuations; and (ii) made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Califano is a citizen of Connecticut.

21.     Defendant Gary L. Countryman ("Countryman") is a CBS director and has been since 2007. Countryman is Chairman of CBS' Audit Committee and has been since 2007. Defendant Countryman knowingly or recklessly: (i) reviewed and approved improper financial statements that did not properly account for CBS' goodwill and intangible asset valuations; and (ii) made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Countryman is a citizen of Massachusetts.

22.     Defendant Charles K. Gifford ("Gifford") is a CBS director and has been since 2006. Gifford is Chairman of CBS' Compensation Committee and has been since at least 2007. Gifford was Chairman of CBS' Audit Committee during at least 2007. Defendant Gifford knowingly or recklessly: (i) reviewed and approved improper financial statements that did not properly account for

- 6 -

CBS' goodwill and intangible asset valuations; and (ii) made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Gifford is a citizen of Massachusetts.

23.     Defendant Bruce S. Gordon ("B. Gordon") is a CBS director and has been since 2006. B. Gordon is a member of CBS' Compensation Committee and has been since at least 2007. B. Gordon was a member of CBS' Audit Committee during at least 2007. Defendant B. Gordon knowingly or recklessly: (i) reviewed and approved improper financial statements that did not properly account for CBS' goodwill and intangible asset valuations; and (ii) made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant B. Gordon is a citizen of New York.

24.     Defendant Linda M. Griego ("Griego") is a CBS director and has been since 2007. Griego is a member of CBS' Audit Committee and has been since 2008. Defendant Griego knowingly or recklessly: (i) reviewed and approved improper financial statements that did not properly account for CBS' goodwill and intangible asset valuations; and (ii) made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Griego is a citizen of California.

25.     Defendant Doug Morris ("Morris") is a CBS director and has been since 2007. Morris is a member of CBS' Audit Committee and has been since 2008. Defendant Morris knowingly or recklessly: (i) reviewed and approved improper financial statements that did not properly account for CBS' goodwill and intangible asset valuations; and (ii) made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Morris is a citizen of New York.

26.     Defendant Frederic V. Salerno ("Salerno") is a CBS director and has been since 2007. Salerno is a member of CBS' Audit Committee and has been since 2008. Defendant Salerno knowingly or recklessly: (i) reviewed and approved improper financial statements that did not properly account for CBS' goodwill and intangible asset valuations; and (ii) made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Salerno is a citizen of New York.

27.     Defendant David R. Andelman ("Andelman") is a CBS director and has been since the Split. Andelman was a director of Former Viacom from 2000 to the Split. Defendant Andelman knowingly or recklessly made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Andelman is a citizen of Massachusetts.

28.     Defendant William S. Cohen ("Cohen") is a CBS director and has been since the Split. Cohen was a director of Former Viacom from 2003 to the Split. Cohen is a member of CBS' Compensation Committee and has been since 2007. Defendant Cohen knowingly or recklessly made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Cohen is a citizen of Maryland.

29.     Defendant Leonard Goldberg ("Goldberg") is a CBS director and has been since 2007. Goldberg is a member of CBS' Compensation Committee and has been since 2008. Defendant Goldberg knowingly or recklessly made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Goldberg is a citizen of California.

30.     Defendant Arnold Kopelson ("Kopelson") is a CBS director and has been since 2007. Defendant Kopelson knowingly or recklessly made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant Kopelson is a citizen of California.

31.     Defendant Shari Redstone ("S. Redstone") is CBS' Vice Chair of the Board and has been since June 2005 and a director and has been since the Split. S. Redstone was a director of Former Viacom from 1994 to the Split. S. Redstone is defendant Redstone's daughter. Defendant S. Redstone knowingly or recklessly made improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations. Defendant S. Redstone is a citizen of Massachusetts.

32.     The defendants identified in ¶¶16-17, 20-31 are referred to herein as the "Director Defendants." The defendants identified in ¶¶20-26 are referred to herein as the "Audit Committee

- 8 -

Defendants." The defendants identified in ¶¶16-19 are referred to herein as the "Officer Defendants." Collectively, the Director Defendants, the Audit Committee Defendants, and the Officer Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.    By reason of their positions as officers, directors, and/or fiduciaries of CBS and because of their ability to control the business and corporate affairs of CBS, the Individual Defendants owed CBS and its shareholders fiduciary obligations of loyalty and due care, and were and are required to use their utmost ability to control and manage CBS in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CBS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.    Each director and officer of the Company owes to CBS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, goodwill, intangible assets, performance, management, valuation, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information. During 2007 and 2008, the Board met eighteen times.

35.    During 2007 and 2008, the Board included defendants Redstone, Moonves, Califano, Countryman, Gifford, B. Gordon, Griego, Morris, Salerno, Andelman, Cohen, Goldberg, Kopelson, and S. Redstone.

36.    In addition to other duties, the Audit Committee Defendants owed specific duties, under its charter in effect during 2007 and 2008, to CBS to review and approve quarterly and annual financial reports included in Forms 10-Q and 10-K and information included in earnings press releases. During 2007 and 2008, the Audit Committee met twelve times. In particular, the Audit Committee's charter provided as follows:

- 9 -

The Committee shall review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," before the filing of the Company's Form 10-K and Form 10-Qs.

The Committee shall discuss generally with management earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee (or a subcommittee thereof) shall review and discuss with management earnings press releases before they are issued.

37.     The Individual Defendants, in abuse of their positions of control and authority as directors and/or officers of CBS, made improper financial statements that were issued by the Company. Because of their advisory, executive, managerial, and directorial positions with CBS, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of CBS, including the Company's valuation of its goodwill and other intangible assets.

38.     Each of the Individual Defendants was the agent of each of the other Individual Defendants and of CBS, and was at all times acting within the course and scope of such agency.

39.     To discharge their duties, the officers and directors of CBS were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of CBS were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the U.S. Securities and Exchange Commission and the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's goodwill and other intangible assets;

(d)     remain informed as to how CBS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in

- 10 -

connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CBS, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants knew or were reckless in not knowing posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of CBS' Board.

41.     The Individual Defendants breached their duties of loyalty and good faith by misrepresenting CBS' financial results, as detailed herein below, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws. As a result, CBS has expended, and will continue to expend, significant sums of money investigating and defending the class action.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

43.     The Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) ensure that National Amusements would not trigger its accelerated

- 11 -

principal payment obligations by issuing improper statements regarding the valuation of CBS' goodwill and other intangible assets; (ii) enhance the Individual Defendants' executive and directorial positions at CBS and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) deceive the investing public, including shareholders of CBS, regarding the Individual Defendants' management of CBS' operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by Individual Defendants.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

44.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to benefit Redstone individually by avoiding National Amusement's accelerated principal payment obligations; to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, overstatement in the value of goodwill and intangible assets financial condition, and future business prospects.

45.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by releasing improper financial statements that, among other things, overstated the book value of CBS intangible goodwill assets.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

47.     CBS is a mass media corporation that operates in television, radio, publishing, and outdoor and interactive advertising.

- 12 -

48.     Defendant Redstone is CBS' founder and, since January 2006, has been CBS' executive chairman. Redstone is also the majority owner of National Amusements, a theater chain. Through National Amusements, in turn, Redstone is the majority owner of CBS. As of April 24, 2009, National Amusements held 81.2% of the voting power of CBS' common stock.

49.     Most of Redstone's wealth is tied up in National Amusements, which during 2008 owed $1.6 billion in loans to a consortium of banks and investors. During 2008, the $1.6 billion in loans were subject to covenants tied directly to the CBS' stock price. When triggered, these covenants required that National Amusements make accelerated principal payments on the $1.6 billion in loans.

50.     Accordingly, when CBS' stock price began to slip during 2008, Redstone desperately wanted CBS to delay the write-down of goodwill and intangible assets as long as possible to avoid a further stock decline and to avoid triggering the loan covenants. But as CBS' book value and market capitalization continued to diverge, Redstone found that he was no longer able to conceal the truth.

## THE $14 BILLION WRITEDOWN

51.     On October 10, 2008, CBS issued a press release announcing a revised business outlook for fiscal 2008. The press release also disclosed a staggering $14 billion write-down of the carrying value of goodwill and intangible assets related to FCC licenses and investments. In particular, the press release disclosed as follows:

> [T]he Company expects to incur a non-cash impairment charge of approximately $14 Billion, in the third quarter of 2008 to reduce the carrying value of goodwill, intangible assets related to FCC licenses and investments.

52.     On October 30, 2008, CBS disclosed that the impairment charge totaled $14.12 billion.

53.     Under SFAS No. 142, goodwill and other intangible assets that are not subject to amortization must be tested for impairment on an annual basis "or more frequently if events or changes in circumstances indicate that the asset might be impaired." The impairment test for goodwill is a two-step process. In the first step, a company compares the fair value of the reporting unit to the reporting unit's carrying amount, including goodwill. If the reporting unit's carrying amount, including goodwill, exceeds the fair value of the reporting unit, the company undertakes the

second step. In the second step, the company determines the fair value of the goodwill ("the implied value of goodwill") and compares it to its carrying amount. Then, the company compares the implied value of the goodwill to the recorded goodwill to determine the impairment.

54.     According to CBS' fiscal 2007 Form 10-K, CBS' intangible assets related to FCC licenses and goodwill were not amortized and were, thus, required to be tested for impairment on an annual basis or sooner if events or circumstances changed that would likely reduce the amount reported in CBS' financial statements. In particular, the 2007 Form 10-K disclosed as follows:

> Goodwill and Intangible Assets—In accordance with Statement of Financial Accounting Standards ("SFAS") 142 "Goodwill and Other Intangible Assets" ("SFAS 142"), the Company's intangible assets are considered to have finite or indefinite lives and are allocated to various reporting units, which are generally consistent with or one level below the Company's operating segments. Intangible assets with finite lives, which primarily consist of leasehold and franchise agreements, are generally amortized by the straight-line method over their estimated useful lives, which range from 3 to 40 years. Intangible assets with indefinite lives, which consist primarily of FCC licenses and goodwill, are not amortized but are tested for impairment on an annual basis and between annual tests if events occur or circumstances change that would more likely than not reduce the fair value below its carrying amount. If the carrying value of goodwill or the intangible asset exceeds its fair value, an impairment loss is recognized as a non-cash charge.

55.     Also, according to CBS' fiscal 2007 Form 10-K, defendants Moonves, Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, B. Gordon, Griego, Kopelson, Morris, S. Redstone, Redstone, and Salerno recognized that CBS could face severe losses due to impairment charges related to goodwill and intangible assets. In particular, these defendants stated:

**The Company Could Suffer Losses Due to Asset Impairment Charges for Goodwill, Intangible Assets, FCC Licenses and Programming**

> In accordance with SFAS 142, the Company will test goodwill and intangible assets, including broadcast licenses, for impairment *during the fourth quarter of each year, and on an interim date should factors or indicators become apparent that would require an interim test*. A downward revision in the fair value of a reporting unit or intangible assets could result in an impairment under SFAS 142 and a non-cash charge would be required.

56.     Not only did those defendants know of the risk of a goodwill write-down, but CBS had also taken massive goodwill write-downs before. During CBS's fourth fiscal quarter 2005, the Company wrote-down $9.5 billion on the values of its goodwill for its television and radio segments. Further, during Former Viacom's fiscal 2004, Former Viacom wrote-down $18 billion to reduce the carrying amount of goodwill and intangible assets related to the Radio and Outdoor business segments. During 2005, defendants Redstone, Moonves, Andelman, Califano, Cohen, S. Redstone

and Reynolds were officers and directors of CBS. During 2004, defendants Redstone, Moonves, Reynolds, Califanao, Andelman, Cohen, and S. Redstone were officers and directors of Former Viacom. Thus, many of the Individual Defendants were familiar with this issue.

57. As of October 1, 2007, CBS' book value on its financial statements was $21.5 billion and its goodwill book value alone was $18.5 billion. Around October 1, 2007, CBS market capitalization fell below CBS' book value and its market capitalization kept falling. As of December 31, 2007, according to CBS' fiscal 2007 Form 10-K, CBS' book value remained approximately at $21.5 billion, but by then its market capitalization had already declined to $18.5 billion, or $3 billion less than its book value. This difference was an indication that the Company's reported value of its goodwill and intangible assets exceeded the value reflected in the Company's market capitalization.

58. Throughout 2008, CBS' market capitalization declined steadily and the gap between the Company's book value and its market capitalization continued to widen. For CBS' fiscal first quarter 2008, the Company's book value as reported in its fiscal first quarter Form 10-Q filed on May 2, 2008 was up incrementally, to approximately $21.7 billion; its market capitalization by then was a mere $15.7 billion—$6 billion less than book value. At that time, the carrying value of CBS' goodwill alone was still $18.5 billion, which meant that the carrying value on CBS' books of its so-called goodwill intangible asset alone was *more valuable than the Company as a whole* as measured by its market capitalization.

59. During CBS' second fiscal quarter 2008, the multi-billion discrepancy between the Company's carrying value and market value widened even further. According CBS' fiscal second quarter Form 10-Q filed August 1, 2008, the Company's book value was up incrementally, to approximately $21.9 billion, while its market capitalization declined to $13.1 billion—$8.8 billion less.

60. The multi-billion discrepancies between the Company's carrying book value and market value and especially the fact that the Company's overall market capitalization was less than the value of the Company's goodwill on its books represented "events or changes in circumstances" under SFAS 142 that required the testing and ultimately the writing down of CBS' intangible assets.

- 15 -

Nevertheless, because of pressure from defendant Redstone, CBS delayed testing for impairment of its intangible assets until during the third quarter of 2008.

61.    Moreover, Jonathan Weil ("Weil"), a columnist with *Bloomberg News* noticed the multi-billion dollar discrepancy between CBS' book value and market capitalization in May 2008, five full months before the write-down. Weil was adamant about the impropriety of CBS' failure to adjust its goodwill downward and wrote a satirical article questioning the value of CBS' goodwill and intangible asset values. In the May 23, 2008 article entitled "Top Ten CBS Excuses for Avoiding Big Writedowns," Weil noted that "[g]oodwill represented 85 percent of CBS' $21.7 billion book value as of March 31." The article also noted CBS' prior $9.5 billion write-down in 2005. Weil's article provided as follows:

> In the past few weeks, "Late Show" host David Letterman has used his Top Ten lists to lampoon drunken teachers, Hillary Clinton and even the Weather Channel.
>
> Here's another candidate for you, Dave: CBS Corp.'s balance sheet.
>
> While his bosses at CBS might believe their company's asset values, Mr. Market doesn't. And I doubt Edward R. Murrow would either.
>
> The math is so simple, Katie Couric could sound-bite it. At $23 a share, CBS has a stock-market value of $15.7 billion. Yet to believe CBS' books, just one of the company's assets, goodwill, by itself was worth $18.5 billion as of March 31.
>
> So, on paper, this single, pneumatic intangible supposedly *is more valuable than the company as a whole.*
>
> As they used to say on CBS' old show The Twilight Zone, "you are now traveling through another dimension." If CBS' audits were an episode of "Survivor," a bunch of that goodwill would have been voted off the island by now.
>
> And what is goodwill? You're breathing it.
>
> Goodwill is nothing more than a ledger entry, representing the premium that one company pays to buy another. Specifically, it's the difference between the purchase price and the fair value of the acquired company's net assets. The more you pay, the more goodwill you get. It can't be sold by itself, either. Hence, the term's synonym: air.
>
> CBS acquired the bulk of its goodwill through its 2000 purchase of -- strangely enough -- CBS.
>
> **Done It Before**
>
> At the time, CBS, the purchaser, was called Viacom Inc. When it split into two publicly traded companies at the end of 2005, the new company took the Viacom

name along with cable-network and entertainment brands like MTV Networks and Paramount Pictures.

The old company was renamed CBS and includes the CBS television and radio networks. Both companies are based in New York and controlled by Sumner Redstone, who is chairman at each.

CBS has taken big goodwill write-downs before, including a $9.5 billion charge to earnings in 2005.

Meanwhile, CBS' stock has declined 27 percent in the past year and trades for about 71 percent of book value, or assets minus liabilities. The discount tells you the market is expecting more writedowns soon, perhaps $6 billion worth, judging by the difference between CBS' book value and market capitalization.

And no wonder. Goodwill represented 85 percent of CBS' $21.7 billion book value at March 31. That doesn't include about $10 billion of other intangible assets, mostly Federal Communications Commission licenses. CBS is poised to add even more goodwill to its books. This month it agreed to buy online news provider Cnet Networks Inc. for $1.8 billion, or about 3.6 times book value.

### Mind the Gap

While a large gap between a company's market capitalization and book value doesn't automatically trigger writedowns, it's a strong indicator that the market values for a company's assets have fallen a lot.

In the section of its latest annual report disclosing risk factors, CBS said it "could suffer losses due to asset impairment charges for goodwill, intangible assets, FCC licenses and programming." *Such charges matter because they mean a company's executives have cut their forecasts for future cash flows, signaling worse trouble ahead.*

A CBS spokesman, Dana McClintock, declined to comment. Of course, the guy I'd really like to hear from is Letterman. He could have a field day with this.

Why let him have all the fun, though? Turnabout is fair play. And after all these years, it's time CBS got a taste of Dave's own medicine. So, here we go.

Top Ten CBS Excuses for Avoiding Big Writedowns:

10. Shh! You'll wake Mr. Redstone.
9. We get our figures watching "The Price Is Right."
8. Ben Bernanke is letting us swap goodwill for Treasuries.
7. Our CFO is busy watching "American Idol" on Fox.
6. You mean that's $18 BILLION? With a B?
5. We put the cast from "Numb3rs" in charge.
4. Ratings boost: We're dumping Andy Rooney for Britney.
3. Moody's and S&P rate Katie Couric AAA.
2. Bear Stearns says the worst is behind us.
1. Dave's got a turnaround plan!

62.    Following the disclosure of the October 10, 2008 write-down, CBS stock value fell

from $10.14 to $8.10 per share and its market capitalization declined by $1.3 billion or 20%.

Defendant Redstone could no longer delay the damage he had sought to avoid by postponing the write-down of CBS' goodwill and other intangibles. Following this decline, defendant Redstone was forced to sell $233 million worth of his shares in CBS and Viacom at depressed prices to meet National Amusement's accelerated principal payments required by the breached loan covenants. As to his CBS holdings, Redstone was forced to sell 17 million shares at $7.10 per share, compared to CBS' peak 2008 share price of approximately $25 per share.

63.     Redstone never intended to sell his shares of his media empire represented by his holdings in CBS and Viacom; and was only forced to do so by the dire circumstances of National Amusements' accelerated loan payments. Indeed, following his forced stock sales, during an October 30, 2008 conference call, Redstone commented: "Now *let me emphasize* that this [the $233 million stock sale] was not something [National Amusements] wanted to do nor is it something [National Amusements] intends to do again."

## IMPROPER FINANCIAL STATEMENTS

64.     As a result of CBS' impairment testing and write-down delay, the company's financial statements contained in its fiscal 2007 annual report on Form 10-K and fiscal first and second quarter 2008 quarterly reports on Form 10-Q were improper because they reported improper valuations of CBS' goodwill and other intangible assets. The Audit Committee defendants knowingly or recklessly reviewed and approved the improper Form 10-K and Forms 10-Q. Moreover, Defendants Moonves, Reynolds, S. Gordon, Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, B. Gordon, Griego, Kopelson, Morris, S. Redstone, Redstone, and Salerno knowingly or recklessly made improper statements within the Form 10-K. Defendants Moonves, Reynolds, and S. Gordon also knowingly or recklessly made improper statements contained in the Form 10-K and Forms 10-Q and certified the filings under the Sarbanes-Oxley Act of 2002 ("SOX"). The improper certifications stated as follows:

I, [Leslie Moonves/Fredric G. Reynolds], certify that:

1.     I have reviewed this quarterly report on Form 10-Q of CBS Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made,

in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        (a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        (b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        (c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        (a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        (b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

65. The improper financial information regarding the valuation of CBS' goodwill and other intangible assets was also included in earnings press release issued on February 26, 2008, April 29, 2008, and July 31, 2008. The Audit Committee Defendants reviewed and approved these improper earnings press releases.

### DAMAGES TO CBS CAUSED BY THE INDIVIDUAL DEFENDANTS

66. As a result of the Individual Defendants' improprieties, CBS disseminated improper financial results stemming from improperly accounted for goodwill and intangible asset valuations. These improper statements have devastated CBS' credibility as reflected by the $1.3 billion market capitalization loss following the disclosure of the $14 billion goodwill and other intangible assets valuation write-down. Additionally, CBS is now the subject of a shareholder class action lawsuit alleging securities laws violations in connection with the misrepresentations regarding the Company's financial results. The Company will face substantial costs in connection with these lawsuits.

67. Further, as a direct and proximate result of the Individual Defendants' actions, CBS has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) CBS incurred costs from compensation and benefits paid to the Individual Defendants who have breached their duties to CBS. These costs include the following:

### CBS FISCAL YEAR 2008 OFFICER COMPENSATION

| Defendant | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|-----------|--------|-------|--------------|---------------|------------------------------|------------------|-------|
| Moonves | $3,513,462 | $9,500,000 | $11,560,836 | $6,833,750 | $324,035 | $229,981 | $31,962,064 |
| Redstone | $1,003,846 | $5,500,000 | $3,768,315 | $1,586,179 | $13,453 | $17,418 | $11,889,211 |
| Reynolds | $1,756,731 | $3,400,000 | $2,163,983 | $1,238,102 | $158,259 | $24,534 | $8,741,609 |

**CBS FISCAL YEAR 2008 DIRECTOR COMPENSATION**

| Defendant | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Change in Pension Value and Non-qualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| Andelman | $78,000 | $73,353 | $31,057 | $26 | $7,500 | $189,936 |
| Califano | $132,000 | $73,353 | $31,057 | $1,252 | $7,500 | $245,162 |
| Cohen | $92,000 | $73,353 | $31,057 | $39 | $7,500 | $203,949 |
| Countryman | $128,000 | $84,048 | $23,108 | $119 | $7,500 | $242,775 |
| Gifford | $136,000 | $73,353 | $29,686 | $1,377 | $7,500 | $247,916 |
| Goldberg | $94,000 | $73,353 | $24,109 | - | $7,500 | $198,962 |
| Gordon, B. | $94,000 | $73,353 | $29,686 | - | $0 | $197,039 |
| Griego | $88,000 | $84,048 | $23,108 | - | $3,900 | $199,056 |
| Kopelson | $76,000 | $84,048 | $23,108 | $17 | $0 | $183,173 |
| Morris | $86,000 | $84,048 | $23,108 | $21 | $0 | $193,177 |
| Redstone, S. | $78,000 | $73,353 | $29,686 | $4 | $7,500 | $188,543 |
| Salerno | $84,000 | $80,996 | $39,444 | $8 | $7,500 | $211,948 |

(b)     CBS incurred costs from investigating and defending CBS and certain officers in the class action lawsuits, plus potentially millions of dollars to settle or otherwise satisfy an adverse judgment.

68.     Moreover, these actions have irreparably damaged CBS' corporate image and goodwill. For at least the foreseeable future, CBS will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that CBS' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69.     Plaintiff brings this action derivatively in the right and for the benefit of CBS to redress injuries suffered, and to be suffered, by CBS as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. CBS is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.     Plaintiff will adequately and fairly represent the interests of CBS in enforcing and prosecuting its rights.

71.     The current Board of CBS consists of the following fourteen individuals: defendants Redstone, Moonves, Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, B. Gordon, Griego, Kopelson, Morris, S. Redstone, and Salerno.

72.     During 2008, Redstone's National Amusements held $1.6 billion in debt that was subject to principal payment covenants directly tied to CBS' stock price. Further, if violated, these principal payment covenants required that National Amusements make accelerated payments on the $1.6 billion. When these covenants were eventually violated, Redstone was forced to sell $233 million worth of his CBS and Viacom holdings, an indication that Redstone did not have the cash on hand to pay back the $1.6 billion in accelerated payments without jeopardizing his media empire. Thus, Redstone was motivated to avoid writing-down CBS' goodwill at all costs, even in the face of the absurd divergence of CBS's market and book values, which, at one point, resulted in CBS' goodwill intangible assets being worth more than the Company's market capitalization. Redstone's dominant 81.2% shareholdings in CBS through National Amusements provided him the opportunity to dominate and control all Board decisions regarding the timing and postponement of CBS' write-down. Accordingly, defendants Moonves, Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, B. Gordon, Griego, Kopelson, Morris, S. Redstone, and Salerno acted to delay the goodwill write-down at Redstone's direction, such that their discretion with respect to the write-down was sterilized. In turn, Redstone benefited from his domination and control as a result of National Amusements' avoidance of accelerated debt payment covenants. Redstone was also unjustly enriched by CBS' goodwill write-down delay. By avoiding the accelerated principal payments, he was able to avoid selling CBS shares for eleven months and his Company, National Amusements avoided the eventual liquidity crisis that required National Amusements to sell off its own assets (including theatre facilities and other assets) at distressed prices in a difficult economic environment. These benefits to Redstone and National Amusements came as a direct result of the detriment caused to CBS by Redstone. Thus, Redstone faces a substantial likelihood of liability for that unjust enrichment. Also, because of Redstone's domination and control of CBS and its board (due to his interest in National Amusement, which in turn holds over 80% of CBS), demand is futile.

- 22 -

73.     Defendants Califano, Countryman, Gifford, B. Gordon, Griego, Morris, and Salerno, as members of the Audit Committee, were responsible under its charter in effect during 2007 and 2008 for reviewing and approving CBS' quarterly and annual financial reports on Forms 10-Q and 10-K and earnings press releases. In particular, the Audit Committee's charter provided as follows:

> The Committee shall review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," before the filing of the Company's Form 10-K and Form 10-Qs.
>
> The Committee shall discuss generally with management earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee (or a subcommittee thereof) shall review and discuss with management earnings press releases before they are issued.

During 2007 and 2008, the Audit Committee met twelve times. The Audit Committee Defendants knew that CBS could face severe losses due to impairment charges related to goodwill and intangible assets. This risk was clearly disclosed by defendants Califano, Countryman, Gifford, B. Gordon, Greigo, Morris, and Salerno in CBS' fiscal 2007 Form 10-K. Moreover, defendants Califano and B. Gordon were especially familiar with goodwill write-downs because they presided over similar write-downs including the $9.5 billion goodwill write-down during CBS' fiscal 2005; and the $18 billion goodwill write-down during Former Viacom's fiscal 2004. The Audit Committee defendants also knew, during 2007 and 2008, of the growing discrepancy between the carrying value of CBS's goodwill and the Company's market capitalization, which grew from $3.2 billion as of December 31, 2007 to $8.8 billion as of August 1, 2008. Despite their duties and knowledge, the Audit Committee Defendants knowingly or recklessly reviewed and approved improper financial statements that did not properly account for CBS' goodwill and intangible asset valuations. The Audit Committee Defendants also made improper financial statements contained within CBS's fiscal 2008 Form 10-K. Accordingly, these defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duty of loyalty and good faith because they: (i) failed to act to direct CBS' to write-down its goodwill; and (ii) reviewed and approved false financial statements that did not accurately report the value of CBS's goodwill in the face of their known duty to act, thereby demonstrating a conscious disregard of their responsibilities. Any demand upon these defendants is futile.

- 23 -

74.    During CBS's fourth fiscal quarter 2005, the Company wrote-down $9.5 billion on the value of its goodwill for its television and radio segments. Also, during Former Viacom's fiscal 2004, Former Viacom wrote down $18 billion to reduce the carrying amount of goodwill and intangible assets related to the Radio and Outdoor business segments. During 2005, defendants Redstone, Moonves, Andelman, Califano, Cohen, and S. Redstone were CBS directors. During 2004, defendants Redstone, Moonves, Reynolds, Califano, Andelman, Cohen, and S. Redstone were directors of Former Viacom, CBS' predecessor. Thus, these defendants were familiar with the relevant accounting rules concerning goodwill write-downs and the risks that CBS' faced from not accurately reporting the value of its goodwill. These defendants also knew, during 2007 and 2008, of the growing discrepancy between the carrying value of CBS's goodwill and the Company's market capitalization, which grew from $3.2 billion as of December 31, 2007 to $8.8 billion as of August 1, 2008. Despite their knowledge and duties as CBS directors, these defendants breached their fiduciary duty of loyalty and good faith because they failed to act to direct CBS' to write-down its goodwill in the face of their known duty to act, thereby demonstrating a conscious disregard of their responsibilities.    Moreover, defendants Moonves, Reynolds, Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, B. Gordon, Griego, Kopelson, Morris, S. Redstone, Redstone, and Salerno breached their fiduciary duties of loyalty and good faith by making improper financial statements in CBS' fiscal 2007 annual report on Form 10-K that did not properly account for CBS goodwill and intangible asset valuations. These defendants face a sufficiently substantial threat of liability for their breaches of fiduciary duties. Any demand upon these defendants is futile.

75.    The principal professional occupation of defendant Moonves is his employment with CBS, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, CBS paid defendant Moonves the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Deferred Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2008 | $3,513,462 | $9,500,000 | $11,560,836 | $6,833,750 | $324,035 | $229,981 |

Accordingly, defendant Moonves is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation

and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Moonves.

76. Defendant Redstone has extensive professional and personal relationships with defendants S. Redstone, Moonves, and Andelman. These relationships include the following:

(a) Defendant S. Redstone is Redstone's daughter. Moreover, S. Redstone is President of defendant' Redstone's private company National Amusements and has been since January 2000. Accordingly, S. Redstone also benefited from CBS' delayed goodwill write-down. In addition, defendants Redstone and S. Redstone are directors of the Combined Jewish Philanthropies; S. Redstone is a Trustee and Redstone is an Honorary Trustee of the Dana-Farber Cancer Institute and S. Redstone is a director and Redstone is the Chairman of the Board of the National Association of Theater Owners.

(b) Defendants Redstone and Moonves have been fellow executives at CBS and Former Viacom for eleven years. Defendant Moonves is the President and CEO of CBS Corporation, a position he was promoted to in 2003, three years after the Viacom-CBS merger in 2000. Before the CBS-Viacom merger, Moonves had been the President and CEO of CBS Television since 1998. Redstone was Former Viacom's CEO from 1996 through the merger and up until the split in 2005. In addition, Moonves is currently Co-Chairman of the Paley Center's L.A. Board of Governors of the Museum of Television and Radio and defendant Redstone is a Trustee of the Paley Center's Museum of Television and Radio.

(c) Defendants Redstone and Andelman have been fellow directors at CBS and Former Viacom for nine years. Andelman is a director of CBS and has been since 2005. Andelman was a director of Former Viacom from 2000 until the split in 2005. Andelman was also a director of defendant Redstone's privately owned National Amusements.

Because of their familial and professional relationships, defendants Redstone, S. Redstone, Moonves and Andelman will not take action against each other as to the claims asserted herein. Accordingly, and demand upon these defendants is futile.

77. The acts complained of constitute violations of the fiduciary duties owed by CBS' officers and directors and these acts are incapable of ratification.

- 25 -

78.     Each of the defendant directors of CBS authorized and/or permitted the improper statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

79.     Any suit by the current directors of CBS to remedy these wrongs would likely expose defendants Redstone, Moonves, Reynolds, and CBS to further violations of the securities laws that would result in actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

80.     CBS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CBS any part of the damages CBS suffered and will suffer thereby.

81.     If Defendant Moonves and S. Gordon were to bring this action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile.

82.     If CBS' current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of CBS. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by CBS against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause CBS to sue themselves or certain of the officers of CBS, there would be no directors' and officers' insurance

protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery from the insurance carriers. If there is no directors' and officers' liability insurance, then the current directors will not cause CBS to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the company from the insurance.

83.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for CBS for any of the wrongdoing alleged by plaintiff herein.

84.     Plaintiff has not made any demand on shareholders of CBS to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     CBS is a publicly held company with over 677 million shares outstanding, and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants Redstone, Moonves, Reynolds, and S. Gordon for Breach of Fiduciary Duties of Due Care, Loyalty, and Good Faith

85.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.     Defendants Redstone, Moonves, Reynolds, and S. Gordon owed and owe CBS fiduciary obligations. By reason of their fiduciary relationships, these defendants owed and owe CBS the highest obligation of due care, loyalty and good faith.

87.     The timing of CBS' write-down and defendant Redstone's subsequent stock sales demonstrate that Redstone violated and breach his fiduciary duties of care, loyalty, and good faith by using his domination and control to force CBS to delay testing of the impairment and write-down of

- 27 -

its goodwill and other intangible assets. As a result of the delay in impairment testing and write-down, CBS' fiscal 2007 and first and second quarter 2008 financial results were improper. Redstone knowingly made these improper financial statements.

88.     Defendants Moonves, Reynolds, and S. Gordon violated and breached their fiduciary duties of care and loyalty and good faith by knowingly or recklessly signing and certifying improper financial statements that did not properly account for the valuation of CBS' goodwill and other intangible assets. These improper financial statements were included in CBS' SEC quarterly and annual reports on Forms 10-Q and 10-K and in CBS' fiscal 2007 and 2008 earnings press releases.

89.     Defendants Redstone, Moonves, Reynolds, and S. Gordon's actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests. These acts were taken to advance the interests of defendant Redstone to the detriment of CBS.

90.     As a direct and proximate result of defendants Redstone, Moonves, Reynolds, and S. Gordon's failure to perform their fiduciary obligations, CBS has sustained significant damages. As a result of the misconduct alleged herein, these defendants are liable to the Company.

## COUNT II

### Against the Audit Committee Defendants for Breach of the Fiduciary Duty of Loyalty and Good Faith

91.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     The Audit Committee Defendants, defendants Califano, Countryman, Gifford, B. Gordon, Griego, Morris, and Salerno, owed and owe CBS fiduciary obligations. Additionally, the Audit Committee Defendants owed specific duties to CBS, under the Audit Committee charter in effect during 2007 and 2008, to review and discuss CBS' quarterly and annual financial results and earnings press releases. By reason of their fiduciary relationships, these defendants owed and owe CBS the highest obligation of loyalty and good faith.

93.    The Audit Committee Defendants violated and breached their fiduciary duty of loyalty and good faith by knowingly or recklessly reviewing and approving improper financial statements that did not properly account for CBS' goodwill and intangible asset valuations.

94.    The Audit Committee Defendants' actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.    As a direct and proximate result of the Audit Committee Defendants' failure to perform their fiduciary obligations, CBS has sustained significant damages.  As a result of the misconduct alleged herein, the Audit Committee Defendants are liable to the Company.

## COUNT III

### Against Defendants S. Redstone and Andelman for Breach of the Fiduciary Duty of Loyalty and Good Faith

96.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.    Defendants S. Redstone and Andelman owed and owe CBS fiduciary obligations.  By reason of their fiduciary relationships, these defendants owed and owe CBS the highest obligation of loyalty and good faith.

98.    Defendants S. Redstone and Andelman violated and breached their fiduciary duty of loyalty and good faith by knowingly or recklessly directing CBS to delay testing of the impairment and write-down of its goodwill and other intangible assets.  By doing do, these defendants engaged in self-dealing because they acted to maintain their standing and compensation as directors of National Amusements.  The benefits to National Amusements that engendered whatever pecuniary benefits they obtained from National Amusements were the direct result of harm caused to CBS by the delay in the impairment and write-down.

99.    Defendants S. Redstone and Andelman's actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

100.    As a direct and proximate result of the defendants S. Redstone and Andelman's failure to perform their fiduciary obligations, CBS has sustained significant damages.  As a result of the misconduct alleged herein, defendants S. Redstone and Andelman are liable to the Company.

## COUNT IV

### Against Defendants Califano, Countryman, Gifford, B. Gordon, Griego, Morris, Salerno, Andelman, Cohen, Goldberg, Kopelson, and S. Redstone for Breach of the Fiduciary Duty of Loyalty and Good Faith

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    Defendants Califano, Countryman, Gifford, B. Gordon, Griego, Morris, Salerno, Andelman, Cohen, Goldberg, Kopelson, and S. Redstone owed and owe CBS fiduciary obligations.

103.    Defendants Califano, Countryman, Gifford, B. Gordon, Griego, Morris, Salerno, Andelman, Cohen, Goldberg, Kopelson, and S. Redstone violated and breached their fiduciary duty of loyalty and good faith by knowingly or recklessly issuing the improper financial statements contained within CBS' fiscal 2007 Form 10-K that did not properly account for CBS' goodwill and intangible asset valuations.

104.    Defendants Califano, Countryman, Gifford, B. Gordon, Griego, Morris, Salerno, Andelman, Cohen, Goldberg, Kopelson, and S. Redstone's actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

105.    As a direct and proximate result of defendants Califano, Countryman, Gifford, B. Gordon, Griego, Morris, Salerno, Andelman, Cohen, Goldberg, Kopelson, and S. Redstone's failure to perform their fiduciary obligations, CBS has sustained significant damages. As a result of the misconduct alleged herein, these defendants are liable to the Company.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets: (i) by directing CBS to delay recognizing impairment of its goodwill and intangible assets to satisfy the interests of defendant Redstone; (ii) by failing to conduct proper supervision; (iii) by paying undeserved bonuses to certain of its executive officers; (iv) by paying undeserved

compensation to certain of its directors; and (iv) by incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

108. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

109. Plaintiff, on behalf of CBS, has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

110. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CBS. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to CBS.

112. Defendant Redstone was further unjustly enriched by CBS' delayed goodwill impairment testing and write-down. During December 2007 through October 2008, the delay allowed Redstone's National Amusements to avoid having to pay accelerated principal on $1.6 billion worth of debt that had covenants directly tied to CBS's stock price. In turn, during that time, Redstone was able to maintain control over his media empire, which includes National Amusements and its controlling interests in CBS and Viacom. Redstone's company, National Amusements, also delayed having to liquidate its own media and theatre assets during the severe economic downturn to pay the accelerated principal payments. When CBS was finally forced to write-down the value of its goodwill, because of the growing multi-billion dollar discrepancy between the Company's book value and market capitalization, Redstone was forced to sell over $233 million worth of his shares in CBS and Viacom at depressed prices to avert National Amusements' potential liquidation—the very situation that he had sought to avoid. Thus, Redstone was unjustly enriched by the eleven month delay during which National Amusements avoided the accelerated loan principal payments. It would be inequitable for Redstone to retain the ill-gotten benefits he obtained during this eleven month payment delay, which he obtained only at CBS' expense.

113.    Defendants S. Redstone and Andelman were also unjustly enriched at CBS' expense. By virtue of delaying the impairment to CBS' good will, they benefitted by maintaining their standing and compensation as directors of National Amusements. The benefits to National Amusements that engendered whatever pecuniary benefits they obtained from National Amusements were the direct result of harm caused to CBS by the delay in the impairment and write-down.

114.    CBS was impoverished by the misconduct that led to Redstone's unjust enrichment as a result of, among other things, the liability and costs CBS now faces as a result of the pending securities lawsuit and its irreparably tarnished corporate image, as alleged above.

115.    Plaintiff, as a shareholder and representative of CBS, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

116.    Plaintiff, on behalf of CBS, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing CBS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CBS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a proposal to ensure timely testing and accurate valuation of CBS' goodwill and other intangible assets;

3.  a proposal to correct CBS' defective internal controls and to improve the Board's independent oversight over the Company's internal controls; and

4.  a proposal to ensure the accuracy of financial information disclosed to shareholders.

C.  Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of CBS has an effective remedy;

D.  Awarding to CBS restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation wrongfully obtained by the defendants;

E.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 11, 2009          LAW OFFICES OF THOMAS G. AMON
                                   THOMAS G. AMON

_____

THOMAS G. AMON

250 West 57th Street, Suite 1316
New York, NY 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427

ROBBINS UMEDA LLP
MARC M. UMEDA
FELIPE J. ARROYO
JULIA M. WILLIAMS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

- 33 -

THE WARNER LAW FIRM
PAUL T. WARNER
11123 McCracken Lane
Cypress, TX 77429
Telephone: (281) 664-7777
Facsimile:  (281) 664-7773

LYNN AGEE
3340 Perimeter Hill Drive
Nashville, TN 37211
Telephone: (615) 831-6799
Facsimile:  (615) 516-6932

Attorneys for Plaintiff

434410_20

## VERIFICATION

I, Lynn Agee, hereby declare as follows:

I, Lynn Agee, as counsel for the Iron Workers District Council of Tennessee Valley & Vicinity Pension Plan, have read the foregoing Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint") on behalf of CBS Corporation and know the contents thereof. I am informed and believe the matters in the Complaint are true and correct.

Executed this December 11, 2009, at Nashville, TN

LYNN AGEE